KOENIG v CITY OF SOUTH HAVEN

Docket No. 109555. Argued January 21, 1999 (Calendar No. 10). Decided
July 20, 1999.

Carol J. Koenig, for herself, and as guardian of her daughter, Jennifer
L. Koenig, a minor, and Frederick G. Koenig brought an action in
the Van Buren Circuit Court against the city of South Haven and
others for injuries received by Jennifer Koenig when a wave swept
her off an Army Corps of Engineers pier. The plaintiffs contended
that South Haven breached its obligations under a memorandum of
understanding with the Corps of Engineers to restrict access to the
piers in inclement weather and that Jennifer was an intended third-
party beneficiary of the memorandum. The court, Meyer
Warshawsky, J., granted summary disposition for the city, finding
that Jennifer was not an intended third-party beneficiary of the
memorandum. The Court of Appeals, DOCTOROFF, P.J., and HOOD and
P. J. SULLIVAN, JJ., reversed in part and remanded in an opinion per
curiam. 221 Mich App 711 (1997) (Docket No. 180870). The city
appeals.

In separate opinions, the Supreme Court *held*:

The plaintiffs' breach of contract claim fails as a matter of law.

Justice TAYLOR, joined by Justices CORRIGAN and YOUNG, stated
that the plaintiffs' daughter was not an intended third-party benefi-
ciary of the memorandum of understanding, and, thus, the plain-
tiffs' breach of contract count must fail as a matter of law.

Because the plaintiffs' daughter was not an intended third-party
beneficiary of the memorandum of understanding, it is not neces-
sary to determine whether the memorandum was a contract. How-
ever, assuming arguendo that the memorandum was a contract,
MCL 600.1405; MSA 27A.1405 governs the ability of third-party ben-
eficiaries to enforce contracts. It does not empower just any per-
son who benefits from a contract to enforce it; rather, it states that
a person is a third-party beneficiary of a contract only when the
promisor undertakes an obligation directly to or for that person. In
general, only intended third-party beneficiaries, not incidental bene-
ficiaries, may enforce a contract under § 1405.

A third-party beneficiary may be one of a class of persons, if the
class is sufficiently described or designated. An objective standard

is to be used to make that determination. In this case, an objective assessment of the memorandum demonstrates that, rather than undertaking an obligation for the benefit of a putative third-party beneficiary, it allocates responsibilities between South Haven and the Army Corps of Engineers regarding restricting access to the piers when conditions were dangerous. The focus of the memorandum is to specify the respective duties of the two parties regarding restricting access to the piers. The memorandum at issue only references the public generally and includes no provision by which the city undertook to do anything directly for a designated class of persons that included the plaintiffs' daughter. This "public" is simply too broad a term to constitute a class that a contracting party could undertake to benefit directly under subsection 1405(1). Accordingly, the city's promises under the memorandum may not be construed as an undertaking directly for the general public. Absent contractual language demonstrating such an undertaking, the plaintiffs cannot establish that the plaintiffs' daughter was a third-party beneficiary of the memorandum under § 1405, and, thus, cannot establish a breach of contract claim under the memorandum as a matter of law.

Chief Justice WEAVER, concurring, stated that it is unnecessary to address whether plaintiffs' daughter was a third-party beneficiary of the memorandum of understanding between the city of South Haven and the Corps of Engineers because the memorandum is not an enforceable contract for lack of valid consideration. Nothing can be treated as consideration that was not so intended by the parties.

The city did not intend its agreement to operate the safety gates to be consideration for an enforceable promise, as witnessed by the terms of the agreement and the circumstances surrounding it. When the city agreed to close the safety gates during conditions that it deemed dangerous, it assumed no obligation beyond what already existed by statute. The plaintiffs may not enforce the memorandum as a matter of law.

Reversed.

Justice BRICKLEY, joined by Justices CAVANAGH and KELLY, dissenting, stated that the majority is incorrect in holding that the memorandum of understanding only references the public generally and includes no provision by which the city undertook to do anything directly for a designated class of persons that included plaintiffs' daughter. In stating that the public is to be restricted from the pier when great danger to persons exists, the memorandum clearly puts the contracting parties on notice that they are empowering third parties to enforce it under the third-party beneficiary statute. That

class, consisting of those people who would use the pier during those dangerous periods, is sufficiently described or designated. The city need not protect anyone else, and may protect this class simply by closing and locking the gates at the appropriate time. Therefore, the class contemplated by the memorandum is not the public in general and is not too broad to constitute a class that a contracting party could undertake directly to benefit under subsection 1405(1).

Subsection 1405(2)(b) provides that if a third-party beneficiary is not ascertainable at the time a promise becomes legally binding on the promisor then his rights shall become vested the moment he becomes ascertainable. Thus, the public is not simply too broad a term to designate a class of third-party beneficiaries if, as in this case, the contract identifies specific conditions from which a class of beneficiaries is to be protected. Under such a contract, individual members of the protected class become ascertainable when they encounter those conditions. There can be little question that those members of the public who would go out onto the pier when great danger to persons exists are the intended beneficiaries of this contract. More important, the parties to the contract were on notice that this class was intended to benefit from the contract, and that members of the class would become ascertainable when they attempted to use the pier during dangerous weather conditions.

*Granzotto & Nicita, P.C.* (by *Angela J. Nicita*), and *Chambers, Steiner, P.C.* (by *Franklin J. Chambers*), for plaintiffs-appellees.

*Cummings, McClorey, Davis & Acho, P.C.* (by *Gail P. Massad*), for defendant-appellant.

TAYLOR, J. This matter arises out of the near-drowning of plaintiffs' daughter when a large wave swept her off a pier in the city of South Haven. Plaintiffs pursued a breach of contract claim against the city under a third-party beneficiary theory. They contended that South Haven breached its obligations under a memorandum of understanding with the Army Corps of Engineers to restrict access to the piers in inclement weather. We conclude that plain-

tiffs' daughter was not an intended third-party benefi-
ciary of the memorandum of understanding. Accord-
ingly, we would reverse the Court of Appeals decision
that reversed the trial court's grant of summary dispo-
sition for South Haven.

### FACTS AND PROCEEDINGS

On May 10, 1990, "senior skip day," plaintiffs'
daughter, Jennifer Koenig, and five other high school
seniors went to the North Pier in South Haven on
Lake Michigan. The weather was drizzling, cold, and
windy. A large wave swept Koenig and two others
(Jeanine Bauman and Dan Caswell) off the pier and
into the water. Bauman was rescued by two men.
Caswell drowned. Two police officers attempted to
rescue plaintiffs' daughter, but were unsuccessful; a
United States Coast Guard tug boat eventually res-
cued her. She suffered anoxic (deprivation of oxygen)
brain damage from the incident and became totally
dependent, requiring twenty-four hour a day care
thereafter. She died while the present case was pend-
ing before the Court of Appeals.

It is undisputed that the piers are owned and were
erected by the Army Corps of Engineers. In January
1972, South Haven and the Detroit District Corps of
Engineers entered into a memorandum of understand-
ing. It stated in pertinent part:

I. Purpose:

This Memorandum of Understanding establishes general
guidelines concerning the furnishing of assistance by the
City of South Haven in regulating the use of Federal Naviga-
tion structures within the City of South Haven, Michigan,

during periods of inclement weather or when danger to persons or property exists, as authorized herein.

II. Authority:

The government hereby gives the City of South Haven the right to enter upon Federal Navigational Structures for the purpose of regulation [of] public use of same.

III. Responsibilities:

A. The Corps of Engineers will furnish and install fence type barricades, with gates at the shore end of Federal pier structures, where required.

B. The City of South Haven, Michigan has been granted responsibility for coordinating and controlling entrance to existing Federal navigational structures at the South Haven Harbor, during period[s] of inclement weather.

C. The responsibility for determining when gates erected on Federal structures are to be opened and closed, rest[s] with the City of South Haven, Michigan.

\*    \*    \*

V. Federal Pier Regulations:

The public shall be restricted from the North and South Federal piers in the City of South Haven during periods of inclement weather and when great danger to persons or property exists, said times to be determined by the City Manager, or a person designated by him. Gates will be locked during each emergency and reopened immediately thereafter.

In an October 6, 1972, letter, the corps provided keys to the fence and gate structures it had recently completed and stated:

We appreciate the cooperation you have expressed in the operation of these safety features on an annual basis, including their placement, removal, and storage.

As the reason the structures are removed is to avoid damage by the winter ice, they need to be removed only for

that period. However, we ask that they be removed no earlier than Labor Day and placed no later than Memorial Day.

On the day of the incident, South Haven had not yet placed the fence and gate structures for the summer season.

Plaintiffs filed a two-count complaint. They sued South Haven for breach of contract, alleging that the memorandum of understanding (MOU) was a contract that required South Haven to preclude access to the piers under dangerous conditions. They contended that their daughter was an intended third-party beneficiary of the MOU and that she had suffered damages from South Haven's breach of its duties under this contract. Plaintiffs also sued individual defendants under the gross negligence exception to governmental immunity established in MCL 691.1407; MSA 3.996(107).

Defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10). The trial court granted South Haven's motion, finding that plaintiffs' daughter was not an intended third-party beneficiary of the MOU. It stated that it need not decide whether the MOU was a contract. It concluded that South Haven merely undertook responsibility for managing the operation of the fence under the MOU; thus, the corps and South Haven made promises to each other in the MOU, not promises to every person who visits the piers. The trial court denied the motion for summary disposition with respect to the individual defendants, concluding that whether they engaged in gross negligence was an issue for the jury.[1] Pursuant

---

[1] The trial court dismissed Allen Vanderberg, one of the individual defendants, because he was not employed by the city on the date of the

to the jury's verdict, the trial court issued a judgment of no cause of action in favor of the individual defendants.

Both parties appealed in the Court of Appeals, which reversed the grant of summary disposition for South Haven on the breach of contract claim and affirmed the jury verdict on the gross negligence claim. 221 Mich App 711; 562 NW2d 509 (1997). In its opinion, the Court noted that the third-party beneficiary statute does not restrict potential third-party beneficiaries to limited groups and concluded that the law does not prohibit a class consisting of "virtually any member of the public who used the government pier during times of inclement weather" from being intended third-party beneficiaries of the MOU. *Id.* at 719. It also found that the clear intention of the MOU was to "protect the safety of individuals who would attempt to use the pier during times of dangerous weather." *Id.* at 719. This led it to conclude that plaintiffs' daughter was an intended third-party beneficiary of the MOU and that the trial court accordingly erred in granting summary disposition for South Haven on this count. Finally, it found that genuine factual issues remained regarding whether South Haven received consideration under the MOU to the extent that the MOU could constitute a contract. *Id.* at 722. Thus, it remanded this matter for trial of the breach of contract count. Regarding the gross negligence count against the individual defendants, the Court affirmed the jury's verdict and further agreed with South Haven's contention that the gross negligence

---

incident. In a separate order, the trial court clarified that the remaining issue for trial was plaintiffs' claim of gross negligence against the individual defendants.

count was barred by the "public duty doctrine."[2] *Id.* at 729. This Court granted leave to determine whether South Haven was entitled to summary disposition of plaintiffs' breach of contract claim. 458 Mich 865 (1998).

STANDARD OF REVIEW

This issue arose in the context of a summary disposition motion made pursuant to MCR 2.116(C)(8) and (10). This Court reviews rulings on summary disposition motions de novo. *Spiek v Dep't of Transportation,* 456 Mich 331, 337; 572 NW2d 201 (1998).

> MCR 2.116(C)(8) tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. The motion must be granted if no factual development could justify the plaintiff's claim for relief. [*Id.*]

> In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4).

> In presenting a motion for summary disposition, the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary

---

[2] The Court of Appeals indicated that it would have reversed the trial court's denial of a directed verdict under this theory if the jury had not already resolved the issue in favor of defendants. *Id.* at 729-730.

evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. [*Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996) (citations omitted).]

### DISCUSSION

We begin with two preliminary observations. First, governmental entities such as South Haven are generally immune from tort liability. MCL 691.1407; MSA 3.996(107). However, governmental immunity does not extend to contract actions, even when the contract action arises out of the same facts that would support a tort action. *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 647; 363 NW2d 641 (1984). Accordingly, governmental immunity does not bar plaintiffs' breach of contract claim against South Haven.

Second, in order to succeed in their breach of contract claim, plaintiffs ordinarily would initially have to demonstrate that the MOU is, in fact, a valid contract. The trial court's conclusion that plaintiffs' daughter was not an intended third-party beneficiary of the MOU made it unnecessary for the trial court to decide whether the MOU was a contract. The Court of Appeals did not decide this issue either; it remanded the matter for trial of plaintiffs' breach of contract count, including whether the MOU was a contract. Our

analysis, set forth below, convinces us that plaintiffs' daughter was not an intended third-party beneficiary of the MOU. Therefore, like the trial court, we need not decide whether the MOU is a contract. Moreover, for purposes of analyzing whether she was an intended third-party beneficiary of the MOU, we will simply assume, arguendo, that the MOU is a contract.

MCL 600.1405; MSA 27A.1405 governs the ability of third-party beneficiaries to enforce contracts. It states in pertinent part:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

Recognizing that a promise may be undertaken directly for a designated class of persons, rather than a person specifically named in the contract, subsection 1405(2)(b) adds:

> If such person is not in being or ascertainable at the time the promise becomes legally binding on the promisor then his rights shall become vested the moment he comes into being or becomes ascertainable if the promise has not been discharged by agreement between the promisor and the promisee in the meantime.

In describing the conditions under which a contractual promise is to be construed as for the benefit of a third party to the contract in § 1405, the Legislature utilized the modifier "directly." Simply stated, section

1405 does not empower just any person who benefits from a contract to enforce it. Rather, it states that a person is a third-party beneficiary of a contract only when the promisor undertakes an obligation "directly" to or for the person. This language indicates the Legislature's intent to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract. Subsection 1405(2)(b)'s recognition that a contract may create a class of third-party beneficiaries that includes a person not yet in being or ascertainable precludes an overly restrictive construction of subsection 1405(1). That is, it precludes a construction that would require precision that is impossible in some circumstances, such as would be the case if there were a requirement in all cases that a third-party beneficiary be referenced by proper name in the contract. This is simply to say that the Legislature, in drafting these two provisions, apparently wanted to strike a balance between an impossible level of specificity and no specificity at all. This means that there must be limits on the use of subsection 1405(2)(b) to broaden the interpretation of subsection 1405(1) because otherwise the result is to remove all meaning from the Legislature's use of the modifier "directly." We are led to this analysis because a court's duty is to give meaning to all sections of a statute and to avoid, if at all possible, nullifying one by an overly broad interpretation of another. See *Hoste v Shanty Creek Management, Inc*, 459 Mich 561; 592 NW2d 360 (1999). It is our duty

then in applying this statute to our facts to comply
with this rule.[3]

---

[3] Further, the context in which Michigan adopted the third-party benefi-
ciary statute also offers guidance in construing the current statute. From
the time of statehood, Michigan adhered to the English common-law rule
prohibiting third parties from suing on a contract. *Guardian Depositors
Corp v Brown*, 290 Mich 433, 438; 287 NW 798 (1939). The Legislature, as
is its prerogative, changed this in 1937 by adopting the predecessor of
§ 1405, which abrogated the total bar and allowed enforcement of a con-
tract by a third party who was the *direct* beneficiary of the contract. This
Court has repeatedly spoken regarding the construction of statutes in der-
ogation of the common law:

> [S]tatutes in derogation of the common law must be strictly con-
> strued, and will not be extended by implication to abrogate estab-
> lished rules of common law. The statute, however, must be con-
> strued sensibly and in harmony with the legislative purpose.
> [*Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502, 508;
> 309 NW2d 163 (1981) (citation omitted).]

> Where there is doubt regarding the meaning of such a statute, it
> is to be "given the effect which makes the least rather than the
> most change in the common law." [*Energetics, Ltd v Whitmill*, 442
> Mich 38, 51; 497 NW2d 497 (1993) (citation omitted).]

Thus, in applying § 1405, we must be cognizant that, inasmuch as the abil-
ity of third-party beneficiaries to enforce a contract was largely unrecog-
nized in Michigan until adoption of the statute, it is to be narrowly con-
strued. (We note that the *Guardian Depositors* Court at 439 contended
that the third-party beneficiary statute is a "remedial" statute that is to be
liberally construed. In *Rookledge v Garwood*, 340 Mich 444, 453; 65 NW2d
785 (1954), this Court quoted 50 Am Jur, Statutes, § 15, pp 33-34 as the
"definitive rule" defining remedial legislation:

> "Legislation which has been regarded as remedial in its nature
> includes statutes which abridge superfluities of former laws, reme-
> dying defects therein, or mischiefs thereof implying an intention to
> reform or extend existing rights, and having for their purpose the
> promotion of justice and the advancement of public welfare and of
> important and beneficial public objects, such as the protection of
> the health, morals, and safety of society, or of the public generally."

Because the third-party beneficiary statute does not meet these criteria,
we disavow the *Guardian Depositors* Court's assertion that it is a "reme-
dial" statute requiring liberal construction. It is the case then that the obli-
gation to narrowly construe § 1405 underscores the importance of giving
meaning to the modifier "directly" in applying this provision.

Initially, it must be noted that there is a temptation to blur the distinction between direct and incidental beneficiaries because, as this case demonstrates, the claims of putative third-party beneficiaries are often compelling. Yet the Legislature, apparently apprehensive about creating a disincentive to contract because of the fear of unanticipated third-party claims, chose to change the law with great caution. It is appropriate that we, as Michigan courts before us, respect this cautious approach.

Decisions of this Court interpreting the third-party beneficiary statute are in harmony with this guarded approach that attempts to be properly permissive in defining persons in a class (subsection 1405[2]) without obliterating the statute's safeguards by disregarding the requirement that an obligation be undertaken *directly* for a third party's benefit (subsection 1405[1]). This careful approach can be seen in *Greenlees v Owen Ames Kimball Co*, 340 Mich 670, 676; 66 NW2d 227 (1954), where this Court, in setting the stage for its analysis of our third-party beneficiary statute, quoted with approval 12 Am Jur, Contracts, § 282, p 834:

> "The principle that one not a party or privy to a contract but who is the beneficiary thereof is entitled to maintain an action for its breach is not so far extended as to give to a third person who is only indirectly and incidentally benefited by the contract the right to sue upon it. An incidental beneficiary has no rights under the contract. A third person cannot maintain an action upon a simple contract merely because he would receive a benefit from its performance or because he is injured by the breach thereof. Where the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach."

The import of this discussion is that as a general matter, even as it is with our statute, only *intended* third-party beneficiaries, not *incidental* beneficiaries, may enforce a contract under § 1405. Similarly, consistent with our specific rule (subsection 1405[2][b]), this Court has adopted the persuasive rule that a third-party beneficiary "may be one of a class of persons, *if the class is sufficiently described or designated.*" *Guardian Depositors Corp v Brown*, 290 Mich 433, 438; 287 NW 798 (1939), citing *Burton v Larkin*, 36 Kan 246; 13 P 398 (1887) (emphasis added). That is, a third-party beneficiary may be a member of a class, but the class must be sufficiently described. This follows ineluctably from subsection 1405(1)'s requirement that an obligation be undertaken *directly* for a person to confer third-party beneficiary status. As can be seen then, this of course means that the class must be something less than the entire universe, e.g., "the public"; otherwise, subsection 1405(2)(b) would rob subsection 1405(1) of any narrowing effect. The rationale would appear to be that a contracting party can only be held to have knowingly undertaken an obligation *directly* for the benefit of a class of persons if the class is reasonably identified. Further, in undertaking this analysis, an objective standard is to be used to determine from the contract itself whether the promisor undertook "to give or to do or to refrain from doing something *directly* to or for" the putative third-party beneficiary. *Guardian Depositors* at 437 (emphasis added). See also *Kammer Asphalt Paving Co, Inc v East China Twp Schools*, 443 Mich 176, 189; 504 NW2d 635 (1993).

An objective assessment of the MOU demonstrates that, rather than undertaking an obligation for the

benefit of a putative third-party beneficiary, it allocates responsibilities between South Haven and the corps regarding restricting access to the piers during periods of dangerous conditions. Section I of the MOU, entitled "Purpose," states that the MOU "establishes general guidelines concerning the furnishing of assistance by the City of South Haven" in regulating the piers when danger exists. Section III, entitled "Responsibilities," states that the corps will furnish and install the fences and gates and that South Haven has been granted responsibility to coordinate and control entrance to the piers during bad weather and to determine when the gates are to be opened and closed. Thus, the focus of the MOU is to specify the respective duties of the two parties regarding restricting access to the pier.[4]

Notwithstanding this, it is undoubtedly the case that the underlying concern in regulating access to the piers was public safety. Section V, entitled, "Federal Pier Regulations," states that "[t]he public" shall be restricted from the piers under specified conditions. Yet to acknowledge this does not answer the question under § 1405, whether the language of the MOU evinces a promise by South Haven by which it undertook, either directly or by suitable class designation, an obligation directly to or for plaintiffs' daughter.

*Greenlees* is instructive regarding this issue because it limned the minimum level of specificity required to put contracting parties on notice that they

---

[4] This language belies the dissent's contentions that "it cannot be argued that the [MOU] was 'primarily,' or even at all for the benefit of 'the parties thereto' " and that "[t]he only reason" the parties entered into the MOU was to protect the public. *Post* at 694-695.

are empowering third parties to enforce a contract. At issue in *Greenlees* was a contract between a landlord and a remodeling contractor. The plaintiff, a tenant with a furrier business in the building, claimed that drilling by the contractor resulted in dust damage to his furs. The plaintiff sued the contractor, claiming to be a third-party beneficiary of the remodeling contract. The contract included a provision that the remodeling work was to be performed "in such a way as to cause a minimum of disturbance to the daytime operations in the building." *Id.* at 676. This was sufficiently specific because the *Greenlees* Court held that this contract provision "was a promise within the meaning of the [third-party beneficiary] statute for the benefit of the tenants as a class who are habitually carrying on the daytime operations in the building . . . ." *Id.* at 677. In other words, it found that the plaintiff was one of a class of direct beneficiaries that had been "sufficiently described or designated" in the contract. See *Guardian Depositors, supra* at 438. Accordingly, the *Greenlees* plaintiff's ability to proceed under a third-party beneficiary theory turned on the fact that a contract provision directly required the contractor to minimize the disturbance to "daytime operations in the building"—a designated class that included the plaintiff's furrier business.[5]

In contrast, the MOU at issue here only references the public generally and includes no provision by which South Haven undertook to do anything directly

___

[5] The dissent questions whether the dust damage to the plaintiff's furs in *Greenlees* constituted a breach of the defendant's promise under the contract. This is, at best, a red herring. The issue before the *Greenlees* Court, and decided by it, was whether the plaintiff could claim third-party beneficiary status. The issue whether there was a breach of the contract is downstream from that adjudication.

for a *designated* class of persons that included plaintiffs' daughter. This is simply too broad a term to constitute a class that as contracting party could undertake *directly* to benefit under subsection 1405(1).

It would demolish the limitations in the statute to *imply* a class on the basis of who might be injured by a breach of South Haven's responsibilities under the MOU. Yet this is indeed what the dissent would hold by finding the class to be those members of the public who are on the piers during dangerous conditions. This reasoning would, of course, mean that virtually every contract could be viewed as impliedly creating a class of third-party beneficiaries because the inquiry would proceed backward from an injury to create a class. Such an analysis robs the statute of all meaning.[6]

Here, had the MOU more specifically described a class of beneficiaries, e.g., anglers, or swimmers, instead of using the all-encompassing term "the public," there could be no doubt that the parties would have been aware that they were directly undertaking to benefit the particular class. This is the requirement the Legislature has enacted, and it is our duty not to obliterate it by giving it a reading, such as the dissent does, that makes it impossible to draw a line between those eligible to sue as third-party beneficiaries and those not eligible. Accordingly, South Haven's promises under the MOU may not be construed as an undertaking directly for the general public. Absent

---

[6] Additionally, the argument that South Haven could have easily protected the public by closing and locking the gates is irrelevant to the issue at hand: whether the MOU's reference to "the public" sufficiently designates a class to confer third-party beneficiary status. That no one would have been hurt if the gates were closed does not bring us closer to an answer to the question before us.

contractual language demonstrating an undertaking directly for the benefit of plaintiffs' daughter or a sufficiently designated class that would include her, plaintiffs cannot establish that she was a third-party beneficiary of the MOU under § 1405. Therefore, plaintiffs cannot establish a breach of contract claim under the MOU as a matter of law.

CONCLUSION

For these reasons, we conclude that plaintiffs' daughter was not an intended third-party beneficiary of the MOU and that their breach of contract count fails as a matter of law. Accordingly, we would reverse the Court of Appeals decision and reinstate the trial court's grant of South Haven's motion for summary disposition of plaintiffs' breach of contract count.

CORRIGAN and YOUNG, JJ., concurred with TAYLOR, J.

WEAVER, C.J. (*concurring*). I concur with the lead opinion's result that plaintiffs' breach of contract count fails as a matter of law. However, I find that it is unnecessary to address whether plaintiffs' daughter was a third-party beneficiary of the memorandum of understanding (MOU) between the city of South Haven and the U.S. Army Corps of Engineers because I would hold that the MOU is not an enforceable contract for lack of valid consideration.

A third party may not enforce a promise if the underlying contract is infirm.[1] Consideration is a

---

[1] MCL 600.1405(2)(a); MSA 27A.1405(2)(a) states:

The rights of a person for whose benefit a promise has been made, as defined in (1), shall be deemed to have become vested,

basic ingredient of any contract. *De Camp v Scofield*, 75 Mich 449, 453; 42 NW 962 (1889). Consideration consists of either a benefit on one side or a detriment on the other. *Plastray Corp v Cole*, 324 Mich 433, 440; 37 NW2d 162 (1949). It is long established that " 'nothing can be treated as a consideration that is not intended as such by the parties.' " *United Fruit Co v United States*, 186 F2d 890, 895 (CA 1, 1951), quoting *Fire Ins Ass'n v Wickham*, 141 US 564, 579; 12 S Ct 84; 35 L Ed 860 (1891). I would hold that the city did not intend its agreement to operate the safety gates to be consideration for an enforceable promise, as witnessed by the terms of the agreement and the circumstances surrounding the agreement.

The dissent suggests that the MOU is an enforceable contract because the city agreed to assume the responsibility for determining when the gates erected on the piers are to be opened and closed and to restrict the public from those structures during periods of inclement weather "in exchange" for the corps' furnishing and installing the gates. However, I do not find that the language of the MOU supports the conclusion that either party considered this "exchange" to be consideration for an enforceable promise or an assumption of liability to third parties.

The language of the MOU, which states that the city "shall" restrict the public from the piers during bad weather, does not, as suggested by the dissent, transform the city's agreement to operate the gates into an enforceable promise. Considering the MOU in its

subject always to such express or implied conditions, limitations, *or infirmities of the contract* to which the rights of the promisee or the promise are subject . . . . [Emphasis added.]

entirety, the MOU merely purports to "establish general guidelines" for the city's "furnishing of assistance . . . in regulating the use" of the pier "during periods of inclement weather or when danger to persons or property exists." The MOU's grant of "responsibility" relative to public safety on the pier is, by the terms of the MOU, discretionary. The MOU ultimately leaves to the city manager, or a person designated by him, when "said times," i.e., inclement weather or danger to the public, exist, so that the gates should be closed.

I disagree with the dissent's suggestion that the MOU imposed requirements on the city beyond that of MCL 281.1191; MSA 18.1287(191). The MOU states that it is the city's responsibility to determine "when gates . . . are to be opened and closed" and that the city is to determine when "great danger to persons or property exists." However, at the time the city signed the MOU, and indeed at the time the plaintiffs' daughter was tragically swept from the pier in 1990, MCL 281.1191; MSA 18.1287(191) (repealed by 1995 PA 58) provided that during inclement conditions "any harbormaster, peace or police officer or other authorized official may rope off or barricade entry to" public docks, piers, wharfs, and retaining walls. Thus, when the city agreed to close the safety gates during conditions that it deemed dangerous, it assumed no obligation beyond what already existed by statute.

The circumstances surrounding the agreement also defy the existence of a bargained-for exchange. At the time the MOU was signed, the city already had jurisdiction over the pier in question. Before the January 1972 date of the MOU, the city's jurisdiction over the pier was established by statute. For example, MCL

780.51; MSA 28.861(101), enacted in 1965 and still effective today, provides:

> A city or incorporated village, having a boundary running to the shoreline of any of the Great Lakes or connecting waters, through its peace officers, with or without a pertinent ordinance, may exercise concurrent jurisdiction as to such waters to enforce any criminal law of this state applicable to the conduct of persons in, on or over such waters . . . .

Further, MCL 3.341; MSA 4.61[2] similarly provided for the city's concurrent jurisdiction on lands under federal control. The fact that the city already shared jurisdiction over the pier with the corps undermines the suggestion that the city's agreement to operate the gates was a bargained-for exchange.

Finally, the record also supports the conclusion that the city did not intend its agreement to be consideration for an enforceable promise. The record reveals that the city had in fact erected warning signs at the entrance to the pier in August 1969, before its first correspondence with the Corps of Engineers in

---

[2] MCL 3.341; MSA 4.61 stated in pertinent part:

[T]he jurisdiction of this state is ceded to the United States of America, over all pieces or parcels of land within this state, which have been selected and acquired by the United States, for the purpose of erecting post offices, custom houses or other structures exclusively owned by the general government . . . . The cession is made upon the express condition that this state shall retain concurrent jurisdiction with the United States, in and over all lands acquired pursuant to this act and that all civil and criminal process issued by a court of competent jurisdiction, or officers having authority of law to issue process, and all orders made by the court, or a judicial officer duly empowered to make the orders, and necessary to be served upon a person, may be executed upon the lands, and in the buildings erected on the land in the same way and manner, as if jurisdiction had not been ceded. [Repealed by 1986 PA 201 and reenacted as MCL 3.258; MSA 4.115(8).]

October 1969 regarding possible safety improvements for the piers. Further, the record reflects that the public used the navigational pier for recreation purposes before the MOU was signed and thus, the city did not derive any new recreational benefit for the public by the agreement.

I would conclude that the city did not intend that its agreement to operate the safety gates to be consideration for an enforceable promise. Considering the MOU as a whole, its terms do not support the existence of a bargained-for exchange. Nor do the circumstances surrounding the agreement, including the fact that the city had concurrent jurisdiction over the pier when the MOU was signed and that it had already taken steps to protect the public from dangerous conditions on the pier before the MOU was signed, support the existence of a bargained-for exchange. For these reasons, I agree that plaintiffs may not enforce the MOU as a matter of law.

BRICKLEY, J. (*dissenting*). This case arose out of the severe injuries that the plaintiffs' decedent sustained when she was swept off a navigational pier into Lake Michigan. Before the occurrence of these events, the defendant city had entered into a memorandum of understanding (MOU) with the U.S. Army Corps of Engineers, which built the pier and another one nearby. In the MOU, the city promised to operate safety gates on the pier in return for the Corps of Engineers granting the city access to the piers. The relevant portion of the MOU stated:

"B. The City of South Haven, Michigan has been granted responsibility for coordinating and controlling entrance to

existing Federal navigational structures at the South Haven
Harbor, during period[s] of inclement weather . . . .

"C. The responsibility for determining when gates erected
on Federal structures are to be opened and closed, rest[s]
with the City of South Haven, Michigan.

\*     \*     \*

"The public *shall be restricted* from the North and South
Federal piers in the City of South Haven *during periods of
inclement weather and when great danger to persons or
property exists*, said times to be determined by the City
Manager, or a person designated by him. *Gates will be
locked during each emergency and reopened immediately
thereafter*." [*Ante* at 671 (emphasis supplied).]

The plaintiffs were foreclosed from suing the city
in tort because of the governmental immunity act.
MCL 691.1407; MSA 3.996(107). Instead, they sued
the city in contract, arguing that the plaintiffs' dece-
dent was an intended third-party beneficiary of the
MOU.[1] The trial court granted summary disposition for
the city on this claim, and the Court of Appeals
reversed.

The lead opinion would decide the case on the
basis of third-party beneficiary law, rather than the
point urged by the city that the MOU is not an enforce-

---

[1] To the extent that the plaintiffs' theory might be construed as a "way
around" sovereign immunity, I note that the Legislature has explicitly
stated that a "contractual undertaking of a governmental agency to main-
tain a state trunkline highway confers contractual rights only on the state
transportation department and does not confer third party beneficiary or
other contractual rights in any other person . . . ." MCL 691.1402(3);
MSA 3.996(102)(3). This statute demonstrates the Legislature's ability to
exempt government defendants from liability for third-party beneficiaries
of intergovernmental contracts. Obviously, this Court should defer to the
Legislature's determination whether and in which situations such liability
is appropriate.

able contract.[2] In deciding that the plaintiffs' decedent was not a third-party beneficiary of the MOU, the lead opinion relies upon the state's statute regarding third-party contract beneficiaries, MCL 600.1405; MSA 27A.1405, and a decision of this Court, *Greenlees v Owen Ames Kimball Co*, 340 Mich 670; 66 NW2d 227 (1954). Neither of these authorities supports the reasoning of the lead opinion, however, and, in fact, both compel a result opposite to the lead opinion.

First, the statute. The lead opinion quotes the relevant statute "in pertinent part":

> "Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

---

[2] The concurrence states that the MOU is not supported by consideration and is therefore not a contract. It is plain, however, that the plaintiff has alleged facts sufficient to show that there is adequate consideration to support this contract. In the MOU, the Corps of Engineers agreed to "furnish and install fence type barricades, with gates at the shore end of Federal pier structures . . . ." The corps was not legally required to furnish or install these gates, and therefore its agreement to do so constituted legal detriment to the corps. In exchange, the city agreed that "the responsibility for determining when gates erected on Federal structures are to be opened and closed, rest[s] with the City of South Haven, Michigan." It also agreed that "[t]he public shall be restricted" from the piers "during periods of inclement weather and when great danger to persons or property exists, said times to be determined by the City Manager . . . ." The concurrence states that the city already had the statutory authority to "rope off or barricade" the pier. MCL 281.1191; MSA 18.1287(191). But the statute does not *require* the city to barricade the pier or even determine whether conditions are too dangerous for the pier to be used: before the MOU, the city manager was free to ignore the weather on Lake Michigan. In contrast, under the MOU, the city manager is contractually obligated to determine "when great danger to persons or property exists," and he "shall" restrict the public from the piers at those times. Thus, the city has assumed a contractual duty constituting legal detriment. Pending proof of these alleged facts, consideration is established. *Plastray Corp v Cole*, 324 Mich 433, 440; 37 NW2d 162 (1949).

"(1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person." [*Ante* at 676, quoting MCL 600.1405; MSA 27A.1405.]

The lead opinion focuses its analysis on the word "directly" in the last sentence of the quoted statute, stating that "[t]his language indicates the Legislature's intent to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract." *Ante* at 677. There can be little doubt that the city was aware that "the scope of [its] contractual undertaking" under the MOU encompassed protecting those people who would go onto the pier during dangerous weather. Furthermore, the protection that the city undertook to provide was limited in scope: shutting and locking the safety gates when the weather conditions turned dangerous.

Thus, the lead opinion is incorrect in holding that the MOU "only references the public generally and includes no provision by which South Haven undertook to do anything directly for a *designated* class of persons that included plaintiffs' daughter." *Id.* at 682-683 (emphasis in the original). In stating that "[t]he public shall be restricted" from the pier "when great danger to persons . . . exists," the MOU clearly "put[s the] contracting parties on notice that they are empowering third parties to enforce a contract" under the third-party beneficiary statute. *Id.* at 681-682. That class, consisting of those people who would use the pier during those dangerous periods, "is sufficiently described or designated." *Guardian Depositors Corp*

*v Brown*, 290 Mich 433, 438; 287 NW 798 (1939). The city need not protect anyone else, and may protect this class simply by closing and locking the gates at the appropriate time. Therefore, the class contemplated by the MOU is not "the 'public'" in general and is not "too broad . . . to constitute a class that a contracting party could undertake *directly* to benefit under subsection 1405(1)." *Ante* at 683.

Significantly, the lead opinion fails to acknowledge the full effect of another "pertinent" section of this same statute on its analysis. Section 1405(2)(b) states that if the third-party beneficiary "is not . . . ascertainable at the time the promise becomes legally binding on the promisor then his rights shall become vested the moment he . . . becomes ascertainable . . . ." MCL 600.1405(2)(b); MSA 27A.1405(2)(b). This section of the statute indicates that "the public" is not "simply too broad a term" to designate a class of third-party beneficiaries if, as here, the contract identifies specific conditions a class of beneficiaries is to be protected from. Under such a contract, individual members of the protected class become ascertainable when they encounter those conditions.

If, as the lead opinion would hold, the Legislature indeed intended that the third-party beneficiary must be "directly referred to in the contract," it surely would not have provided for *unascertainable* third-party beneficiaries, nor would it have provided that such beneficiaries' rights in the contract vest once the person "becomes ascertainable." As quoted above, the contract in the instant case provides that "the public *shall* be restricted" from the piers in question "during periods of inclement weather and *when great danger to persons* or property exists . . . . *Gates will be*

*locked during each emergency and reopened imme-diately thereafter.*" There can be little question that those members of the public who would go out onto the pier "when great danger to persons" exists are the intended beneficiaries of this contract. More impor-tant, the parties to the contract were on notice that this class was intended to benefit from the contract, and that members of the class would become ascer-tainable when they attempted to use the pier during dangerous weather conditions.

Next, the lead opinion discusses our decision in *Greenlees, supra,* characterizing it as instructive regarding "the minimum level of specificity required to put contracting parties on notice that they are empowering third parties to enforce a contract." *Ante* at 681-682. But the "specific" language in the *Green-lees* contract is no more specific than that in the instant case. In *Greenlees,* a building owner and a construction company contracted for renovation of the building. The contract stated that the work was to be performed " 'in such a way as to cause a minimum of disturbance to the daytime operations in the build-ing.' " *Ante* at 682, quoting *Greenlees* at 676. The plaintiff in *Greenlees* was a furrier who was a tenant of the building, and whose merchandise was damaged by dust caused by the contractor's work. This Court permitted the furrier to sue as an intended third-party beneficiary of the contract, relying upon the quoted contractual language.

Reading that language, however, it is apparent that, while the plaintiff was a tenant and a member of " 'a class who are habitually carrying on the daytime operations in the building,' " *ante* at 682, the contrac-tor was only put on notice that his work should not

cause too much disruption during the day. A common-sense reading of the contractual section relied upon by the lead opinion would only lead one to the conclusion that the contractor should not disturb business in the building by having his workmen or equipment in the public spaces during working hours. He would not be on notice that he has a duty to protect the tenants from dust damage.

In sharp contrast, in the instant case, it is difficult to imagine what purpose the contract might have except the protection of those members of the public who would venture out onto the pier during dangerous weather. This class of beneficiaries could be easily protected by simply carrying out the only real duty imposed on the city by the MOU: closing and locking the safety gates. The lead opinion attempts to answer this point by stating that "the focus of the MOU is to specify the respective duties of the two parties regarding restricting access to the pier." *Ante* at 681. But this explanation ignores the only purpose of "restricting access to the pier," which was to keep people off the pier when "great danger to persons or property exists."

The lead opinion notes this Court's approval in the *Greenlees* opinion of the American Jurisprudence restatement of third-party beneficiary law. Part of the section quoted by the lead opinion states that " '[w]here the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach.' " *Ante* at 679, quoting *Greenlees* at 676, quoting 12 Am Jur, Contracts, § 282, p 834. But it cannot be argued that the contract in the instant case was "primarily," or even at all for the

benefit of "the parties thereto." The only reason the parties entered into this contract was to benefit those members of the public who might go out onto the pier when it was dangerous to do so. This is a specific class of intended beneficiaries who clearly have the legal right to enforce the contract, once they become "ascertainable." MCL 600.1405; MSA 27A.1405.

For these reasons, I respectfully dissent and would affirm the decision of the Court of Appeals.

CAVANAGH and KELLY, JJ., concurred with BRICKLEY, J.