*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ERIC PRESTON,

        Plaintiff-Appellant,

v

ABBOTT POINTE ASSOCIATES, LLC, and DTN MANAGEMENT CO.,

        Defendants-Appellees.

UNPUBLISHED
March 07, 2025
11:59 AM

No. 361133
Ingham Circuit Court
LC No. 21-000408-NZ

Before: GADOLA, P.J., and PATEL and MALDONADO, JJ.

PER CURIAM.

Plaintiff, Eric Preston, appeals by right the trial court's order granting summary disposition in favor of defendants, Abbott Pointe Associates, LLC (Abbott) and DTN Management Company (DTN), pursuant to MCR 2.116(C)(7) (claim is barred by release). Plaintiff resided in an apartment owned by Abbott and managed by DTN, and he was poisoned by toxic mold present in the apartment, purportedly as a result of defendants' omissions. On appeal, plaintiff disputes the trial court's conclusion that his claims against defendants were barred by a release agreement he signed in exchange for his relocation to a different apartment. We affirm.

## I. BACKGROUND

In October 2018, plaintiff was living in a basement-level apartment owned by Abbott and operated by DTN when he alerted DTN about water damage in his apartment. According to plaintiff, DTN failed to take sufficient measures to remedy the situation, and he subsequently began experiencing health problems. Plaintiff performed air quality testing in January 2019 and discovered that the apartment had been contaminated by toxic mold. Plaintiff alerted DTN and requested that he be given a different unit; DTN granted this request on the condition that he sign a contract releasing it from liability. The release provided, in relevant part:

> For and in consideration of the mutual release resulting from the claims made by Eric Preston, including the balance of the Lease Agreement with the exception of any physical damages present in the apartment at the time the apartment is surrendered on or before March 11, relocating from Apt. G-04 to Apt.

-1-

F-08 for the same lease term, but specific rates and provisions to be addressed in the new Lease Agreement, Eric Preston, resident of 321 E. Pointe Lane Apt. #G-04 *do/does hereby and for his/her/their heirs, executors, administrators, successors and assigns, release, acquit and forever discharge DTN Management Co and his/her/their agents, servants, successors, heirs, executors, insurers and administrators, and all other persons, firms, corporations, associations or partnerships* of and from any and all actions, causes of action, claims or demands for damages, costs, loss of use, loss of services, loss of consortium, expenses, compensation, consequential damage or any other thing whatsoever, including attorney's fees, in law or in equity on account of, or in any way growing out of, any and all known and unknown, foreseen and unforeseen bodily and personal injuries and/or property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred during the time frame up to and including January 29, 2019 at or near Abbott Pointe Apartments c/o DTN Management Co., 204 E. Pointe Lane, in the City of East Lansing, State of Michigan.

The undersigned acknowledges and assumes all risk, chance or hazard that said injury or damage may be or become permanent, progressive, greater, or more extensive than is now known, anticipated or expected.

The undersigned understands and agrees that this is a compromise settlement of a doubtful claim and that the RELEASE is not to be construed as an admission of liability on the part of these hereby released, which liability is expressly denied. Furthermore, *it is agreed by all parties that this claim is confidential and will not be discussed with a third party. If this claim does not remain confidential, this settlement will become void* and tenant will be responsible for any damages owed to DTN Management Co. as specified in the original lease contractual agreement, including, but not limited to, loss of rent, liquidated cost, et al.

The undersigned further declares and represents that no promise, inducement or agreement not herein expressed has been made to the undersigned and that this RELEASE contains the entire agreement between the parties hereto, and that the terms of this RELEASE are contractual and not a mere recital. [Emphasis added.]

This agreement was signed on March 7, 2019.

Plaintiff's health continued to deteriorate, and in June 2021, he initiated the instant litigation, raising common law claims of premises liability and ordinary negligence as well as a statutory claim alleging breach of landlord/tenant duties.[1] Defendants moved for summary disposition pursuant to MCR 2.116(C)(7), citing the release signed by plaintiff in 2019. The trial court granted defendants' motion, and plaintiff then filed a motion for reconsideration. Plaintiff's

---

[1] The release of liability was not mentioned in the complaint.

attorney then withdrew, and he filed an *in propria persona* motion to amend his complaint, arguing that the release did not apply to harm caused after January 29, 2019, and alleging additional damages he incurred after that date. The trial court denied both motions, and this appeal followed.

Oral arguments were conducted on April 5, 2023. Following oral arguments, we remanded this case to the trial court in order "to develop the factual record with respect to the relationship between Abbott Pointe Associates, LLC and DTN Management Co, and to develop the factual record regarding Plaintiff's alleged breach of the confidentiality clause." The court was also ordered to "consider whether Plaintiff breached the confidentiality clause and whether that breach voided the release."[2] On remand, the trial court reopened discovery and allowed the parties to submit memorandums of law addressing the issues. The court again concluded that the terms of the release applied to both Abbott and DTN. Regarding the confidentiality clause, the court concluded that "[i]f maintaining confidentiality was a condition that needed to be met in order to prevent the release from becoming void . . . then it is necessary to recognize that . . . plaintiff intentionally caused the condition to fail (and deliberately breached the parties' contract) by discussing his claims with others." The court concluded that it would not rescind the contract in its entirety on the basis of plaintiff's intentional breach, particularly given plaintiff's failure to tender back the consideration received.

Proceedings on remand having concluded, this case is now before us for resolution of the merits.

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition, and the evidence is viewed in a light most favorable to the nonmoving party. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Summary disposition is appropriate pursuant to MCR 2.116(C)(7), when, among other reasons, there has been a release.

> A party may support a motion under MCR 2.116(C)(7) by affidavits, depositions, admissions, or other documentary evidence. If such material is submitted, it must be considered. MCR 2.116(G)(5). Moreover, the substance or content of the supporting proofs must be admissible in evidence. Unlike a motion under subsection (C)(10), a movant under MCR 2.116(C)(7) is not required to file supportive material, and the opposing party need not reply with supportive material. The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant. [*Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999) (citations omitted).]

Releases are contracts, and the principles of contract law therefore apply. *Shay v Aldrich*, 487 Mich 648, 660; 790 NW2d 629 (2010). This Court reviews de novo as a question of law the proper interpretation of a contract, including a trial court's determination of whether contract language is ambiguous. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d

---

[2] *Preston v Abbott Pointe Assoc LLC*, unpublished order of the Court of Appeals, issued April 19, 2023 (Docket No. 361133).

447 (2003). The goal of contractual interpretation is to determine the intent of the parties, and unambiguous language must be given its plain meaning. *Shay*, 487 Mich at 660. The courts may consider extrinsic evidence to determine the intent of the parties if the language of a contract is ambiguous. *Id*. Extrinsic evidence regarding the circumstances under which an instrument was formed may also be introduced to show a latent ambiguity. *Id*. at 667-671.

## III. SCOPE OF RELEASE AGREEMENT

Plaintiff argues that Abbott was not included in the classes of entities listed in the release as being protected by its terms. We disagree.

It is undisputed that Abbott was not a party to the release and did not provide consideration for being released from liability. Therefore, Abbott cannot enforce the agreement absent a showing that it was an intended third-party beneficiary thereof. See MCL 600.1405.[3] Under the terms of the contract, plaintiff agreed to release "DTN Management Co and his/her/their agents, servants, successors, heirs, executors, insurers and administrators, and all other persons, firms, corporations, associations or partnerships" from liability arising from his allegations.

Also in *Shay*, the Michigan Supreme Court determined that it is appropriate to consider extrinsic evidence to interpret a broad release agreement. *Shay*, 487 Mich at 648. In that case, the plaintiff alleged that he was assaulted by Melvindale and Allen Park police officers, and he filed suit against each of the officers allegedly involved. *Id*. at 651-652. The plaintiff subsequently reached case evaluation agreements with the Allen Park Officers but not the Melvindale officers, so "[t]he Allen Park Officers were dismissed from the case, while a trial date was set for the remaining defendants, the three Melvindale Officers." *Id*. at 652-653. The plaintiff signed release agreements with the Allen Park officers that provided, in relevant part:

> For the sole consideration of TWELVE THOUSAND FIVE HUNDRED AND NO/100 ($12,500.00) DOLLARS to me in hand paid by **Michigan Municipal Liability and Property Pool** do for ourselves, executors, administrators, successors and assigns, discharge, **ALLEN PARK POLICE OFFICER KEVIN LOCKLEAR**[4] and Michigan Municipal Liability and Property Pool, insurer, *together with all other persons, firms and corporations*, from any and all claims, demands and actions which I have now or may have arising out of any and all damages, expenses, and any loss or damage resulting from an incident occurring on September 8, 2004. [*Id*. at 653 (quotation marks omitted; emphasis added).]

---

[3] MCL 600.1405 provides, "Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee." MCL 600.1405(1) provides, "A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person."

[4] An identical document released the other Allen Park officer. *Shay*, 487 Mich at 653.

-4-

The Melvindale officers then sought summary disposition pursuant to MCR 2.116(C)(7), arguing that they were insulated from liability under the terms of the above-quoted release because it applied to "all other persons." *Id*. at 653-654. The Supreme Court heard the case after the trial court denied this motion and this Court reversed. *Id*. at 656.

The Supreme Court began its analysis by noting that, in Michigan, the release of one joint tortfeasor only releases the other joint tortfeasors if the terms of the release so provide and that principles of contract law apply when interpreting a release. *Id*. at 660 (citing MCL 600.2925d(a)). The Supreme Court further noted that the Melvindale officers were not involved with negotiations of the releases and that no parties to the Allen Park officers' releases intended that the Melvindale Officers would benefit. *Id*. at 661-662. The Supreme Court then laid out the relevant provisions of MCL 600.1405 and explained how it had previously construed these provisions:

> This Court has interpreted the applicable statutory language as follows: In describing the conditions under which a contractual promise is to be construed as for the benefit of a third party to the contract in § 1405, the Legislature utilized the modifier "directly." Simply stated, section 1405 does not empower just any person who benefits from a contract to enforce it. *Rather, it states that a person is a third-party beneficiary of a contract only when the promisor undertakes an obligation "directly" to or for the person.* This language indicates the Legislature's intent to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract. This Court has additionally explained that a third-party beneficiary may be a member of a class, but the class must be sufficiently described. [*Id*. at 662-663 (quotation marks and citations omitted; emphasis in original) (quoting *Koenig v South Haven*, 460 Mich 667, 676-677; 597 NW2d 99 (1999)).]

Applying those principles to the case before it, the Supreme Court stated that "in order for the Melvindale Officers to qualify as third-party beneficiaries, the language of the releases must have demonstrated an undertaking by plaintiff directly for the benefit of the Melvindale Officers or for a sufficiently designated class that would include the Melvindale Officers." The Supreme Court then determined that the Melvindale officers were third-party beneficiaries of the release because the scope of a release is governed by objective standards, and the release plainly applied to "all other persons." *Id*. at 665. However, this alone did not mean that the Melvindale officers were insulated from liability because traditional contract principles would be used to determine the extent of a third-party beneficiary's rights. *Id*. at 666. Put differently, the Melvindale officers had the right to enforce the contract, but this did not mean that the contract conferred upon them the relief they sought; determination of whether they were entitled to such relief would require application of the traditional principles of contract law. *Id*.

When applying contract law to that case, the Supreme Court provided an overview of the parol evidence rule, noting that extrinsic evidence may only be used to interpret a contract that is ambiguous, but that extrinsic evidence also may be used to determine whether a *latent* ambiguity exists. *Id*. at 667-668.

A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings. To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Id*. at 668 (quotation marks and citations omitted).]

In other words, when a court interprets a contract, it must consider extrinsic evidence to determine whether there is a latent ambiguity; if that question is answered in the affirmative, the extrinsic evidence must be examined a second time to resolve this ambiguity. *Id*. The Supreme Court stated that "[c]ourts are obligated in construing releases such as those at issue, to effectuate the intent of the parties, and extrinsic evidence is admissible to the extent necessary to do so." *Id*. at 670-671. The Supreme Court then examined the extrinsic evidence presented to it and concluded that "the clear intent of the parties" was that the Melvindale officers would not be released. *Id*. at 671-672. The Court noted that it was "not a case in which a stranger to a contract or release comes forward" seeking to benefit, but rather, the parties seeking to benefit from the release "were readily ascertainable" at the time of its inception. *Id*. at 674.

In the present case, in accordance with the framework laid out in *Shay*, we must first examine the text of the release through an objective lens to determine whether Abbott was a third-party beneficiary of the contract. *Shay*, 487 Mich 665. This requires a determination of whether Abbott, as a limited liability company, can be classified as a person, firm, corporation, association, or partnership. The release does not provide any definitions for any words used, so the words in the release should be given their common and ordinary meanings. *Terrien v Zwit*, 467 Mich 56, 76; 648 NW2d 602 (2002). Plaintiff offers extensive argument regarding the nature of Abbott's corporate form. However, in addition to the specific class of corporations, the release also prevents the imposition of liability against any "firms." A firm is defined as "a business unit or enterprise." *Merriam-Webster's Collegiate Dictionary* (11th ed).[5] Under this definition, Abbott is clearly classified as a firm.[6] Therefore, Abbott is a third-party beneficiary under the terms of the release. However, as the Supreme Court instructed us in *Shay*, this is not the conclusion of our analysis. *Id*. at 666.

This next step in our analysis is to apply the traditional principles of contract law to the facts of this case to determine the extent of Abbott's rights as third-party beneficiaries. *Id*. Consistent with the parol evidence rule, we must examine any extrinsic evidence presented by the

---

[5] It is appropriate to consult a dictionary to ascertain the plain meaning of an undefined term. *Bauer v Saginaw Co*, 332 Mich App 174, 193; 955 NW2d 553 (2020).

[6] Plaintiff argues that the trial court exceeded the scope of the remand order by concluding that Abbott could fall within the plain meaning of "person" or "firm" as the terms are used in the release agreement. We believe that this determination was within the scope of our broad directive to develop the factual record regarding the relationship between Abbott and DTN.

parties to determine whether there is a latent ambiguity regarding whether the parties intended for Abbott to be protected by the release. *Id.* at 667-668. In *Shay*, the Supreme Court determined that the Melvindale officers were not protected by the release at issue because there was an abundance of evidence presented by all parties that the contracting parties intended for the Melvindale officers to be excluded from the release, *id.* at 671-672; no such evidence exists in the present case. First, unlike *Shay*, neither defendant in this case has conceded that they did not intend for Abbott to be included in the release. Indeed, both DTN and Abbott maintain that their intent was for each of them to be protected, and neither has presented any evidence to the contrary. The only evidence presented by plaintiff consists of a pair of self-serving affidavits, one executed by plaintiff and one executed by his father. If anything, these affidavits support the assertion that plaintiff and his father did not, in practice, view DTN and Abbott as distinct entities. In plaintiff's affidavit he described his interactions with the "Abbott Pointe property manager" as well as his interactions with "the Manager of the Compliance Department at DTN Management." At the conclusion he said, "They made the release" mandatory for him to get a new apartment; "they" presumably referred to both of the above-mentioned individuals. Moreover, plaintiff's father referred only to the individuals with whom he interacted and made no explicit reference to either entity purportedly subject to the terms of the release. Whereas the plaintiff in Shay clearly intended to release the Allen Park officers and proceed against the Melvindale officers, there is nothing in the record suggesting that plaintiff ever had any intention of separating these two entities for the purposes of these proceedings.

Therefore, we conclude that the release unambiguously applies to both DTN and Abbott.

## IV. CONFIDENTIALITY PROVISION

Plaintiff argues that he nullified the release agreement by violating the terms of its confidentiality clause. We disagree.

Plaintiff's argument is based on the following provision of the release agreement:

> "[I]t is agreed by all parties that this claim is confidential and will not be discussed with a third party. If this claim does not remain confidential, this settlement will become void and tenant will be responsible for any damages owed to DTN Management Co. as specified in the original lease contractual agreement, including, but not limited to, loss of rent, liquidated cost, et al.

Plaintiff avers that, pursuant to this provision, he nullified the release agreement by discussing it with third parties.

Plaintiff essentially argues that he is entitled to rescission of the release agreement by virtue of his own breach. "Rescission is an equitable remedy which is granted only in the sound discretion of the court." *Lenawee Co Bd of Health v Messerly*, 417 Mich 17, 31; 331 NW2d 203 (1982). A court "will not grant rescission unless the party requesting it is blameless." *Stanton v*

*Dachille*, 186 Mich App 247, 260; 463 NW2d 479 (1990).[7] Breaching a contract "negates any such finding of innocence" by the breaching party. *Id.* Plaintiff argues that he is entitled to rescission of the release agreement, despite accepting the consideration, because he intentionally breached the confidentiality clause. The trial court correctly concluded that, even if the record supported defendant's assertion that he breached the contract, he cannot assert his own breach as grounds for rescission because he is not a "blameless" party. See *id.*

Affirmed. Defendants, being the prevailing parties, may tax costs. MCR 7.219(A)(1).

/s/ Michael F. Gadola
/s/ Sima G. Patel
/s/ Allie Greenleaf Maldonado

---

[7] *Stanton* was released on November 19, 1990, and it is therefore binding. See MCR 7.215(J)(1) (explaining that opinions issued on or after November 1, 1990, are binding on this Court).