*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT MURRAY, CHAD ANDERSON,
ANDREA ANDERSON, NORMA BLACK,
ROBERT BURGIN, C & L PROPERTIES OF
KALKASKA, DAVID CHMIELEWSKI, SUSAN
CHMIELEWSKI, CHRISTINA COLE, SHARON
DETMER, BARRY FOUNTAIN, SHARON
FOUNTAIN, GARY GOLDEN, MELBA
GOLDEN, WILLOWDEEN GOLDEN, RALPH
HARSHMAN, MARCY HARSHMAN, PAUL
HARSHMAN, DIANE HARSHMAN, JUDY
HOEK, LAKE FIVE INVESTMENTS, LLC,
JUDY MURRAY, the FRANK R. PFLUM
TRUST, by ROSE PFLUM, Trustee, NEIL
ROCKEY, MARTHA ROCKEY, LAUREL
ROOT, PATRICIA ROOT, MARK SCHUBEL,
PAT SCHUBEL, RONNIE SHAW, KIM SHAW,
THOMAS P. SHENEMAN, DEAN SIETING,
MICHELE SIETING, TERRY SIETING, JANET
SIETING, SMP INVESTMENT
CORPORATION, INC., SUNSET SHORES
DEVELOPMENT, SUNSET SHORES
FINANCIAL, INC., CALVIN TERHAAR, GAIL
TERHAAR, MIKE WOODMAN, CHRIS
WOODMAN, LAURA ZINGG RONALD
ZINGG, and NANCY ZINGG,

UNPUBLISHED
March 19, 2020

Plaintiffs-Appellants,

v

No. 346062
Kalkaska Circuit Court
LC No. 14-011789-CH

CHESAPEAKE ENERGY CORPORATION, OIL
NIAGARAN, LLC, NORTHERN MICHIGAN
EXPLORATION COMPANY, SILVER LAKE
ENERGY, LLC, REDSKY LAND, LLC, and OIL
ENERGY CORPORATION,

Defendants-Appellees.

-1-

Before:  O'BRIEN, P.J., and JANSEN and GLEICHER, JJ.

PER CURIAM.

Various oil and gas companies planned to explore for minerals in the northern lower peninsula and arranged to pay signing bonuses to landowners willing to lease their mineral rights. Before all the agreements were reduced to writing, the companies changed their minds.  In a separate action, those landowners who had executed agreements with the oil and gas companies received their signing bonuses.  The plaintiffs in this appeal did not have completed agreements and were not part of that earlier settlement.  The circuit court summarily dismissed plaintiffs' current breach-of-contract action because the leasing "agreements" did not comport with the statute of frauds.  We affirm.

## I.  FACTS

Plaintiffs are landowners in Kalkaska, Antrim, Cheboygan, Missaukee, and Grand Traverse Counties.  In 2010, a number of companies were interested in obtaining leases for mineral rights for oil and gas.  One of these companies, defendant Chesapeake Energy Corporation, worked through defendant Silver Lake Energy, LLC to acquire access to private land by contracting for leases with various landowners.  An employee of Silver Lake, Al Couturier, entered into leasing discussions with Robert Murray, one of the plaintiffs.  In addition to offering to lease the land, the companies offered to pay up-front "signing bonuses" to various property owners.  The bonuses would be paid to the landowner regardless of whether defendants drilled any wells on the property or paid any future royalties.  Murray, who allegedly owned more than 2,000 acres (some with coowners) advised Couturier that he would represent the interests of certain other owners, collectively the "Group A plaintiffs."

On June 16, 2010, Couturier and Murray signed a letter of intent (LOI), providing that Murray and his coowners would lease the land in which Murray had an interest in exchange for a signing bonus of $1,900 an acre.  Attached to this document as Exhibit A was a list of the coowners, listed by name and property description.  Two of these parties included C&L Properties of Kalkaska and the Frank R. Pflum Trust.  The LOI included a specific royalty payment for oil and gas removed from the land and a lease term.  The LOI also stated that the parties agreed to execute the "Oil and Gas Lease attached hereto as exhibit A" contemporaneously with the execution of the LOI.  However, Exhibit A did not contain a separate lease; it contained only the list of properties and owners, and a "market enhancement clause."  In addition, under the terms of the LOI, Silver Lake had five days to approve the terms of the LOI and an additional seven to "deliver to owner a completed lease and method of payment of said bonus consideration[.]"  An addendum to the LOI, also signed on June 16, 2010, provided in part that Murray was only representing the other landowners in entering into the LOI and that the other owners would be responsible for their own negotiations.

On June 25, 2010, Murray and Couturier signed another agreement (the "June 25 agreement") that provided:

The undersigned referral agent and the undersigned oil, gas, mineral agent (landman) agree to the following:

Murray, the referring agent, from time to time will provide the landman names and contact information of property/mineral owners for him to contact.

Landman understands that Murray has an agreement in writing with the property/mineral owners providing the terms for a fee to be paid to Murray, and Murray agrees to provide landman with a full executed copy of said agreement. Landman agrees to honor that agreement and pay the referral fee to Murray, and said fee shall be deducted from lessors['] bonus proceeds at the agreed percentage of proceeds as stated in said agreement, a copy of which is attached hereto.

Also, prior to landman submitting payment of said fee to Murray, the property/mineral owner/lessor must execute a payment directive authorizing landman to pay said fee to Murray. This payment directive must be provided to landman at the same time any oil and gas lease is executed by the property/mineral owner.

The agreement contained an attached "Exhibit A," which did not list any individual landowners. It contained a table listing townships, acres of land, and a column titled "description," which contained what appears to be a list of the sections in the respective townships in which the parcels were located, such as "28N-6W." The exhibit also contained the notations "$1,750 per ac.," "3/16 Royalty," and "5+5." These additional landowners are referred to as the "Group B plaintiffs."

According to Murray, he met with individual Group B landowners and many signed referral agreements. Murray claimed that he referred all of the Group B landowners to defendants and provided defendants with the signed referral agreements. Couturier testified in his deposition that Murray brought Silver Lake copies of the referral agreements, names of potential lessors, plat maps and legal descriptions for lessors, and potential lessors other than those initially listed in Exhibit A of the LOI. The referral agreements signed by the Group B plaintiffs specifically stated that in exchange for a 10% referral fee taken from the initial royalty bonus, "[Murray] will give your contact information to oil landmen he has a relationship with. If you do not do business with them, you have no obligation to Murray."

At least three leases were signed by Group A plaintiffs: those for C&L, the Pflum Trust, and one for property owned by Level Acres, which raises no challenges on appeal. However, none of the Group B plaintiffs entered into separate LOIs or leases with defendants. Indeed, Silver Lake had yet to return the completed leases to Murray for the landowners' signatures before outside considerations caused Chesapeake to reconsider its mineral exploration plan. According to plaintiffs, Chesapeake and the other gas and oil companies decided to withdraw from their leasing ventures. In an e-mail exchange on July 25, 2010, Chesapeake instructed Silver Lake to freeze all acquisition and leasing efforts.

Plaintiffs filed suit on October 23, 2014, raising claims that included breach of contract and promissory estoppel. While this suit was pending, the Michigan Attorney General initiated a separate proceeding against Chesapeake pursuant to the Michigan Antitrust Reform Act, MCL

445.771 *et seq*. Eventually, the state and Chesapeake reached a settlement under which Chesapeake set up a fund to pay private landowners who had signed "enforceable" oil and gas leases with Chesapeake's affiliates in 2010. To receive payment from the fund, qualified landowners were first required to execute a release. Plaintiffs C&L and the Pflum Trust were among the landowners entitled to receive payment from the fund, and individuals purporting to represent those plaintiffs signed releases.

This matter moved forward. Defendants ultimately sought summary disposition and the circuit court found that the LOI contained the necessary elements to constitute a valid agreement for Chesapeake to enter into a future agreement with the Group A plaintiffs. The court noted that Murray signed the agreement on behalf of himself and the Group A plaintiffs, and that the agreement listed the other landowners, the properties involved, and the consideration. The circuit court agreed with defendants that the LOI itself did not satisfy the statute of frauds, MCL 566.108, because the Group A plaintiffs failed to give Murray written authority to enter into the agreement on their behalves. However, the court also found that if defendants had acted as they agreed to under the LOI and in accordance with their assurances to the Group A plaintiffs, those plaintiffs would have had written leases that would have adequately satisfied the statute of frauds. The court thus held that the Group A plaintiffs' inability to sign the leases could not be used by defendants to avoid liability. The court also held that the Group A plaintiffs had stated a valid claim for equitable (actually promissory) estoppel.

The Group B plaintiffs did not fare as well. The court found that these plaintiffs did not have an LOI that identified them. Viewing the evidence in a light most favorable to the plaintiffs, the court noted that a bonus per acre amount was set, but none of the Group B plaintiffs were identified at the time of the referral agreement. Therefore, the agreement was unenforceable.

Following a separate summary disposition motion, the circuit court dismissed the remaining claims of the Pflum Trust and C&L involving their "nonleased" properties (those for which no lease had been entered with defendants). The court emphasized that these plaintiffs' representatives had collected compensation from the fund in relation to the lands over which leases had been entered, and had signed the required releases. Those releases applied to *all* claims involving the Pflum Trust's and C&L's properties, not just those for which compensation was paid. The circuit court denied these plaintiffs' motion for reconsideration and a third motion claiming that the Pflum Trust release was invalid.

The parties subsequently reached a settlement that resolved all of the Group A plaintiffs' claims. Thus, the only claims remaining on this appeal are those of the Group B plaintiffs, C&L, and the Pflum Trust.

## II. CLAIMS OF THE GROUP B PLAINTIFFS

The Group B plaintiffs maintain that they are entitled to the signing bonus amount of $1,750 an acre pursuant to the June 25 agreement, which they contend is not governed by the statute of frauds. They also maintain that, if the statute of frauds does apply, the circuit court erred by failing to review the June 25 agreement in conjunction with the LOI and other documentation submitted by plaintiffs. Plaintiffs further argue that they qualify as third-party beneficiaries of the June 25 agreement.

-4-

The circuit court determined that the statute of frauds barred the Group B plaintiffs' claims because the June 25 agreement did not identify them and they never entered into any agreement addressing the material terms between them and Chesapeake. Thus, the issue whether the statute of frauds applies and whether it was satisfied by the June 25 agreement is preserved. However, plaintiffs did not contend that the court could consider extrinsic evidence to determine the rights of the Group B plaintiffs until their motion for reconsideration. "Where an issue is first presented in a motion for reconsideration, it is not properly preserved." *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009). Moreover, plaintiffs never argued below that the agreement between Murray and Silver Lake created a third-party beneficiary claim for the benefit of the Group B plaintiffs. However, we "may review an unpreserved issue if it is an issue of law for which all the relevant facts are available." *Id*.

We review de novo a circuit court's summary disposition ruling. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013). The circuit court granted defendants' motion under MCR 2.116(C)(10). In reviewing a motion brought under (C)(10), we consider the "affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to" the nonmoving party to determine whether "the substantively admissible evidence" creates a genuine issue of material fact that should proceed to trial. *Maiden v Rozwood*, 461 Mich 109, 119-121; 597 NW2d 817 (1999).

We review de novo as questions of law "whether contract language is ambiguous" and "the proper interpretation of a contract." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). Similarly, the interpretation of a statute is a question of law to be reviewed de novo. *Lear Corp v Dep't of Treasury*, 299 Mich App 533, 537; 831 NW2d 255 (2013). However, we review plaintiffs' unpreserved claims for plain error affecting substantial rights. *Total Armored Car Serv, Inc v Dep't of Treasury*, 325 Mich App 403, 412; 926 NW2d 276 (2018). "To merit relief, the injured party must show prejudice, i.e., that the error affected the outcome of the . . . proceedings." *Id*.

The June 25 agreement, even when considered in conjunction with the other writings presented, does not satisfy either the "form" or "substance" requirements of the statute of frauds as it applies to an interest in land. Plaintiffs have also failed to show that they qualify as intended third-party beneficiaries of the June 25 agreement.

In *AFT Mich v Michigan*, 303 Mich App 651, 661; 846 NW2d 583 (2014), aff'd 497 Mich 197 (2015), this Court stated:

> A party claiming a breach of contract must establish by a preponderance of the evidence (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach. A valid contract has five elements: (1) parties competent to

-5-

contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. [Cleaned up.[1]]

"Our goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc,* 499 Mich 127, 143-144; 881 NW2d 95 (2016). However, "[w]ords should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the agreement as a whole." *Thiel v Goyings*, 504 Mich 484, 501; ___ NW2d ___ (2019) (cleaned up.) "[W]here a term is not defined in a contract, we will interpret such term in accordance with its commonly used meaning." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 215; 737 NW2d 670 (2007) (cleaned up).

## A. STATUTE OF FRAUDS

In Michigan, with one exception, "the *form* of a contract for the sale or lease of land is dictated by the statute of frauds." *Zurcher v Herveat*, 238 Mich App 267, 276; 605 NW2d 329 (1999). MCL 566.106 and MCL 566.108 make up Michigan's statute of frauds and provide:

> No estate or interest in lands, other than leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing. [MCL 566.106.]

> Every contract for the leasing for a longer period than 1 year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing . . . . [MCL 566.108.]

"Simply put, . . . a contract for the sale of land must, to survive a challenge under the statute of frauds, (1) be in writing and (2) be signed by the seller or someone lawfully authorized by the seller in writing." *Zurcher*, 238 Mich App at 277. "Contracts conveying an interest in land made by an agent having no written authority are invalid under the statute of frauds unless ratified by the principal." *Forge v Smith*, 458 Mich 198, 208-209; 580 NW2d 876 (1998).

There are also requirements for the *substance* of a contract for the sale of land. *Zurcher*, 238 Mich App at 276.

---

[1] This opinion uses the new parenthetical "cleaned up" to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

A general requirement for a valid contract for the sale of land is that it contain certain essential elements. 77 Am Jur 2d, Vendor and Purchaser, § 5, p 121. More specifically, "such a contract must generally be in writing and must set forth the terms of the agreement with sufficient certainty and definiteness, specifying the identities of the parties and their mutual assent, the property which is the subject of the contract, the price of such property, and the consideration." *Id*. at 121-122. [*Zurcher*, 238 Mich App at 282.]

One essential element is "an adequate description of the land be included in the contract." *Id*. "Such a description is acceptable 'if it discloses with sufficient certainty what the intention of the grantor is with respect to the quantity and location of the land to which reference is made so that its identification is practicable.' " *Id.*, quoting 77 Am Jur 2d, Vendor and Purchaser, § 11, p 126. A second essential element, "the identification of the parties," is met "by designating 'the names of the buyer and the seller with sufficient certainty so as to identify them.' " *Zurcher*, 238 Mich App at 282, quoting 77 Am Jur 2d, Vendor and Purchaser, § 12, p 127. A third is "consideration," which requires the contract " 'either set forth the price to be paid by the purchaser or furnish a basis from which the price may be ascertained.' " *Zurcher*, 238 Mich App at 282, quoting 77 Am Jur 2d, Vendor and Purchaser, § 8, p 124.

Plaintiffs correctly posit that the circuit court should have looked at the LOI and the June 25 agreement together, although it is not clear that the circuit court failed to do so. The writing requirement of the statute of frauds "may be satisfied by several writings made at different times," or a series of writings, " 'up to the time the action is brought to enforce the contract,' " as long as the documents considered together establish the agreement's essential terms. *Kelly-Stehney & Assoc, Inc* v *MacDonald's Indus Prod, Inc (On Remand)*, 265 Mich App 105, 113-114; 693 NW2d 394 (2005), quoting 4 Corbin, Contracts (rev ed), § 22.8, p 773. See also *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354, 367; 320 NW2d 836 (1982) ("[T]he 'nothing in parol' approach to the statute of frauds has been so dishonored in this Court that it has lost any claim to legitimacy."). However, "extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement." *Id.*

More generally, Michigan courts allow extrinsic evidence to be used to explain a "patent" ambiguity or to discover and interpret a "latent" ambiguity in a contract.

An ambiguity may either be patent or latent. This Court has held that extrinsic evidence may not be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document. However, extrinsic evidence may be used to show that a latent ambiguity exists. . . . A latent ambiguity . . . is one that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed. Because the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist.

A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings. To verify the

existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010) (cleaned up).]

However, "[p]arol evidence under the guise of a claimed latent ambiguity is not permissible to vary, add to or contradict the plainly expressed terms of [a] writing or to substitute a different contract for it to show an intention or purpose not therein expressed." *Mich Chandelier Co v Morse*, 297 Mich 41, 48; 297 NW 64 (1941) (cleaned up). Also, as a general rule, "a court must never cross the point at which the written contract is *altered* under the guise of contract *interpretation*." *Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 218; 702 NW2d 106 (2005). Extrinsic evidence thus cannot be used to contradict the clear language of an agreement.

The June 25 agreement is subject to the statute of frauds because it involves "an estate or interest in lands, other than [a lease] for a term not exceeding 1 year, . . . any trust or power over or concerning lands, or in any manner relating thereto." MCL 566.106. Although plaintiffs characterize this agreement as involving the mere payment of money, the agreement provides on its face that it relates to the lease of land. Moreover, plaintiffs claim that they are entitled to the signing bonuses based on their status as landowners and defendants' status as lessees of plaintiffs' mineral rights. Therefore, plaintiffs were required to provide substantively admissible evidence that satisfied both the form and substance requirements of the statute of frauds with respect to the Group B plaintiffs' properties in order to survive summary disposition.

Contrary to plaintiffs' contentions, the June 25 agreement on its own is the underlying contract in this case, although the LOI and other documents entered by the various parties are relevant to fleshing out the terms of the June 25 agreement. In this regard, we note that the LOI makes no mention of the Group B plaintiffs as they were not even in contemplation at that point. Indeed, the June 25 agreement only alludes to Group B plaintiffs. The LOI and the June 25 agreement are also fundamentally different. The LOI relates to an ongoing "agreement to agree" between the landowners and Silver Lake. The June 25 agreement discusses Murray's right to a referral fee from various landowners he would connect with defendants. Plaintiffs contend that the June 25 agreement includes an essentially hidden promise by Chesapeake to lease the Group B plaintiffs' mineral rights. Ultimately, however, other documents such as the LOI, the referral agreements and their included property descriptions, and any lists created by Chesapeake can be considered to flesh out the June 25 agreement, *Thiel*, 504 Mich at 501, but those other documents may not be used to alter, vary, or contradict the June 25 agreement's otherwise plain and unambiguous terms. See *Grosse Pointe Park*, 473 Mich at 218; *Opdyke*, 413 Mich at 367; *Mich Chandelier Co*, 297 Mich at 48.

Plaintiffs imply that the June 25 agreement meets the form and substance requirements of the statute of frauds because it identifies the parties (Murray and Chesapeake), refers to specific consideration of 10% of the landowners' $1,750-an-acre signing bonus, and identifies the relevant properties, particularly when coupled with the property descriptions in the later referrals. This

would arguably be correct if *Murray* were suing for payment of the 10% referral fee. However, because *plaintiffs* are claiming that the June 25 agreement entitles them to payment of the signing bonus, they must meet the requirements in connection with the leases—or potential leases—of their *own* properties.

With respect to the Group B plaintiffs, neither the June 25 agreement standing alone nor all the documents considered together meet the "form" requirements to satisfy the statute of frauds. The June 25 agreement is in writing, but it is not "signed by the seller or someone lawfully authorized by the seller in writing." *Zurcher*, 238 Mich App at 277. The other documents do not mend this deficiency. The LOI makes no mention of the Group B plaintiffs and Murray did not sign the LOI on the Group B plaintiffs' behalf (he signed it on behalf of himself and the Group A plaintiffs). Chesapeake's lists of properties contain no signatures. The only documents that some of the Group B plaintiffs personally signed were the releases, but those documents clearly state that plaintiffs had to yet to enter any mineral lease agreements. And no document signed by Murray could bind the Group B plaintiffs; he did not have that authority. Even if Murray could bind them, the Group B plaintiffs never argued that Murray actually signed a lease or an LOI on their behalf. The June 25 agreement is not an LOI or a lease, and the LOI Murray did sign specifically includes only the Group A plaintiffs. There simply are no writings that show that Murray had explicit authority to enter into either the June 25 agreement or to sign any other lease documents on behalf of the Group B plaintiffs. To the contrary, the deposition testimony shows that he did not.

Plaintiffs also rely on statements in Couturier's affidavit and deposition that a "Joe McFerron" authorized Couturier to contract with the Group B plaintiffs by use of the LOI and June 25 agreement instead of the usual oil and gas leases because Silver Lake's offices were busy, or that McFerron agreed to pay the bonuses if "Murray and his people" agreed to sign the leases. However, any statements attributable to McFerron would be inadmissible hearsay. MRE 801; MRE 802. In any event, McFerron's alleged statements are not evidence that the Group B plaintiffs either considered Murray their agent or were willing to sign leases without negotiation, thus ratifying Murray's actions on their behalf. Ultimately, plaintiffs have presented no substantively admissible evidence, such as affidavits from any of the Group B landowners, that they were prepared to sign a lease with Chesapeake, that they intended Murray to act as their agent in order to sign an LOI or lease or on their behalf, or that they ratified any attempt by Murray to act on their behalf.

For these reasons, we hold that the Group B plaintiffs have failed to meet the "form" requirements to satisfy the statute of frauds. The failure in form renders irrelevant whether the statute of frauds "substance" requirements were met and we need not consider the parties' additional challenges.

## B. AVOIDABILITY OF THE STATUTE OF FRAUDS

Plaintiffs also raise a modified version of their argument below that defendants' actions should prevent them from relying on the statute of frauds as a defense. Plaintiffs appear to now argue that defendants' abandonment of the mineral exploration plan and subsequent failure to pay signing bonuses to those landowners with whom it had actually contracted somehow transforms the contract into one for the payment of money, rather than an interest in land. The cases cited by

plaintiffs do not support this claim. Instead, they only support the general proposition that a party to a contract cannot be allowed to rely on that party's own failure to perform as a condition to defeat the contract. See *Stanton v Dachille*, 186 Mich App 247, 258; 463 NW2d 479 (1990).

Further, an analysis similar to that applied by the circuit court to the Group A plaintiffs to avoid application of the statute of frauds, even if correct, will not aid the Group B plaintiffs. The circumstances of the Group A plaintiffs are factually distinguishable from those in Group B. Murray had signed a LOI on behalf of himself and the Group A plaintiffs. Murray averred that he had an interest in each of the Group A plaintiffs' properties and that he was acting as the representative for those plaintiffs. The LOI provides support that the other Group A plaintiffs intended him to act on their behalf and that they would ratify his actions. Other evidence was presented to support this as well. Moreover, as the circuit court discussed, the LOI specifically required defendants to provide the Group A plaintiffs with a completed lease within 12 days, and defendants did not do so.

In contrast, the Group B plaintiffs were under no obligation to enter into a lease at the time defendants decided not to pursue them. They had not signed any LOI. The written referral agreements specifically provided no authority for Murray to act other than to deliver the referral agreements to defendants, and plaintiffs have presented no substantially admissible evidence to the contrary, such as affidavits that they were ready and willing to sign leases with Chesapeake without additional negotiation or that they agreed to have Murray do so for them. In addition, under the June 25 agreement, defendants were not obligated to accept the referral agreements or act on them until Murray delivered signed leases from the plaintiffs. Moreover, nothing prevented any of the plaintiffs from actually signing an LOI and presenting it to defendants to be signed. For these reasons, we reject plaintiffs' argument that defendants should be prevented from relying on the statute of frauds.

## C. THIRD-PARTY BENEFICIARY

For the first time on appeal, plaintiffs contend that they can enforce the June 25 agreement between Murray and defendants as intended third-party beneficiaries of the agreement. The third-party beneficiary statute, MCL 600.1405, provides, in pertinent part:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or to refrain from doing something directly to or for said person.
>
> * * *
>
> (b) If such person is not in being or ascertainable at the time the promise becomes legally binding on the promisor then his rights shall become vested the moment he comes into being or becomes ascertainable if the promise has not been discharged by agreement between the promisor and the promisee in the meantime.

With respect to the distinction between incidental and intended beneficiaries, our Supreme Court has provided the following comprehensive discussion:

> Importantly, the plain language of this statute reflects that not every person incidentally benefitted by a contractual promise has a right to sue for breach of that promise, but rather only if the promisor has "undertaken to give or to do or refrain from doing something *directly* to or for said person." MCL 600.1405(1) (emphasis added).
>
> In other words, MCL 600.1405 draws a distinction between intended third-party beneficiaries who may sue for a breach of a contractual promise in their favor, and incidental third-party beneficiaries who may not. In this regard, we agree with and adopt the following statutory analysis from the lead opinion in [*Koenig v South Haven*, 460 Mich 667, 680; 597 NW2d 99 (1999)]:
>
> > In describing the conditions under which a contractual promise is to be construed as for the benefit of a third party to the contract in [MCL 600.1405], the Legislature utilized the modifier "directly." Simply stated, section 1405 does not empower just any person who benefits from a contract to enforce it. Rather, it states that a person is a third-party beneficiary of a contract only when the promisor undertakes an obligation "directly" to or for the person. This language indicates the Legislature's intent to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract. . . . [*Brunsell v City of Zeeland*, 467 Mich 293, 296-298; 651 NW2d 388 (2002).]

In contrast:

> " 'A third person cannot maintain an action upon a simple contract merely because he would receive a benefit from its performance or because he is injured by the breach thereof. Where the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach.' " [*Koenig*, 460 Mich at 679, quoting *Greenlees v Owen Ames Kimball Co*, 340 Mich 670, 676; 66 NW2d 227 (1954), quoting 12 Am Jur, Contracts, § 282, p 834.]

When deciding whether a person or entity is an intended beneficiary, a court must use an objective standard "to determine from the contract itself whether the promisor undertook to give or to do or to refrain from doing something *directly* to or for the putative third-party beneficiary." *Brunsell*, 467 Mich at 297 (cleaned up). "Therefore[,] the parties' motives and subjective intentions are not relevant in determining whether plaintiff is a third-party beneficiary." *Rieth-Riley Constr Co v Dep't of Transp*, 136 Mich App 425, 430; 357 NW2d 62 (1984).

Plaintiffs cannot show that they are intended third-party beneficiaries of the June 25 agreement, even if that agreement is reviewed in conjunction with the earlier LOI and the other writings. The June 25 agreement does not contain any promise by defendants directly for the benefit of the Group B plaintiffs. It is primarily for the benefit of defendants and Murray, whereby these parties agreed that Murray would be paid if his referral of other landowners resulted in a signed lease by those landowners. The LOI is an agreement between Murray, on behalf of himself and the Group A plaintiffs, to enter into such a lease. It does not contain a promise by defendants directly for the benefit of the Group B plaintiffs. The LOI can be used to determine what an acceptable "lease" is with respect to payment under the June 25 agreement or the terms Murray could discuss with the landowners concerning what defendants were prepared to offer. However, the documents explicitly provide that they are not agreements to contract and that the landowners did not have to contract with defendants at all. Defendants' various lists reflect, at most, their subjective intent that the landowners would eventually sign leases with them,[2] and the lists are not relevant to determining whether the June 25 agreement actually contained a direct promise toward the Group B plaintiffs. To the extent it would be admissible, additional evidence (such as the deposition statements by Murray and Couturier) are also evidence of the parties' subjective beliefs. Given the evidence presented, plaintiffs have not shown that they were intended third-party beneficiaries of the June 25 agreement merely because they would have received a benefit from defendants' performance of that agreement or because they could be injured by its breach.

## III. THE C&L AND PFLUM TRUST NONLEASED CLAIMS

Plaintiffs argue that the circuit court erred when it dismissed the claims of plaintiffs Pflum Trust and C&L with respect to their nonleased properties (those for which leases were not entered) on the basis that their claims were within the scope of a release that representatives for those two entities signed in connection with their leased properties. Generally, "[w]hen the plaintiffs' claims are barred because of a release, summary disposition is proper under MCR 2.116(C)(7). The interpretation of a release presents a question of law that is reviewed de novo." *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 373-374; 838 NW2d 720 (2013) (cleaned up).

"A claim may be barred because of a release." *Cole v Ladbroke Racing Mich, Inc*, 241 Mich App 1, 13; 614 NW2d 169 (2000). The Pflum Trust and C&L entered into identical releases with respect to their leased properties, which provided, in pertinent part:

> In exchange for the receipt of the Settlement Award issued by the Settlement Fund's Escrow Agent, I hereby on behalf of myself, as well as on behalf of my heirs, successors, assigns, and all representatives, *do hereby release, waive, and forever discharge any and all claims,* whether civil, criminal, or administrative, demands, suits, causes of actions, relief, damages, liabilities of any nature, as well as costs, expenses, and attorney's fees, *I have, which are known or unknown, accrued or unaccrued, against Chesapeake Energy Corporation*, and all of its parents, affiliates, subsidiaries, divisions, officers, directors, shareholders, advisors, employees and agents *as well as . . . Silver Lake Energy, LLC . . .* (collectively

---

[2] They also are arguably inaccurate with respect to the status of the Group B plaintiffs, none of whom ever signed LOIs.

''Brokers'') and all of the Brokers' former and current affiliates, officers, directors, owners, members, shareholders, employees, agents and contractors (collectively the "Released Parties").

I understand that upon receipt of the Settlement Award check, I will have *no further right or remedy against the Released Parties*, or against the Attorney General of the State of Michigan, the Claims Administrator, or the Escrow Agent. I understand that this Release becomes effective and irrevocable when; (i) l negotiate (i .e., deposit or cash) the check that is the Settlement Award, or (ii) upon forty-five (45) days following my receipt of the award check. whichever occurs earlier.

I understand that I have had the opportunity to seek independent legal, financial , and accounting counsel prior to executing this Release, and have sought counsel if I so chose. [Emphasis added.]

## A.  SCOPE OF THE RELEASE

The language of the release evidences a clear intent to waive and release "any and all claims . . . which are known or unknown, accrued or unaccrued, against Chesapeake Energy Corporation," to which plaintiffs agreed that they would have "no further right or remedy." This language plainly encompasses *all claims* of the Pflum Trust and C&L against Chesapeake and other entities, and thus includes any claims concerning plaintiffs' nonleased properties. See *Dresden v Detroit Macomb Hosp Corp*, 218 Mich App 292, 297-298; 553 NW2d 387 (1996) (discussing the broad nature of release language pertaining " 'any and all' causes of action" and concluding that it applied to bar a fraud claim); *Heritage Resources, Inc v Caterpillar Fin Servs Corp*, 284 Mich App 617, 642; 774 NW2d 332 (2009) ("There cannot be any broader classification than the word 'all.' In its ordinary and natural meaning, the word 'all' leaves no room for exceptions.") (cleaned up). Accordingly, the circuit court correctly determined that the release foreclosed any claims of the Pflum Trust and C&L concerning the nonleased properties.

Despite this unambiguous language, plaintiffs argue that they should be permitted to offer extrinsic evidence to show the existence of a latent ambiguity in the releases. Even considering the extrinsic evidence, plaintiffs' claim fails as the cited evidence does not demonstrate an ambiguity. The cited e-mail exchange between one of defendants' attorneys and an assistant attorney general states that an executed lease was a requisite for payment under the fund, but makes no attempt to describe the scope of the release. It therefore sheds no light on the issue at all.

Plaintiffs also contend that the first line of the release creates an ambiguity; specifically that the landowner signs the release in exchange for an award payment, while the release itself does not assert to cover other claims the signor might have against defendants. However, this release term is not confusing. Unlike in *Shay*, where the Court allowed extrinsic evidence to be considered to explain a term in the release, plaintiffs here seek to impermissibly use extrinsic evidence to directly contradict the plain language in the release. Extrinsic evidence cannot be used in this manner. *Grosse Pointe Park*, 473 Mich at 218; *Mich Chandelier Co*, 297 Mich at 48.

-13-

Plaintiffs argue that there was no consideration for the release with respect to the nonleased properties. However, there was consideration—being able to resolve their claims concerning the leased properties without further litigation where the outcome was uncertain. This could also serve as consideration for the Pflum Trust and C&L giving up their claims for the nonleased properties. The certainty of some monetary payment was valuable consideration "worth far more than the legendary peppercorn," *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 241; 644 NW2d 734 (2002), particularly considering the tenuous nature of the claims involving the nonleased properties, as discussed earlier.

Accordingly, we hold that the releases signed by the representatives of the Pflum Trust and C&L concerning their leased properties in connection with obtaining settlement funds also released any claims these plaintiffs might have had against defendants concerning the nonleased properties.

## B. THE PFLUM TRUST

The Pflum Trust also argues that David Pflum did not have authority to release the claims concerning the nonleased parcels formerly owned by the Pflum Trust because, at the time the release was signed, none of the property remained in the trust as it had been transferred to FRP Investments, LLC. We note, however, that defendants present former trustee Rosalie Pflum's March 30, 2017 release that she signed on behalf of the trust. Although this release was not attached to any motion below, defendants did offer on the record to present a copy of this release and the circuit court found it unnecessary to review before making its ruling. Under MRE 7.210(A)(3), evidence offered in the trial court may be included as part of the record on appeal. As defendants offered to provide the document below and were rebuffed by the circuit court, we will deem it part of the record. And the document establishes that the Pflum Trust release was actually signed by a party with authorization to do so.

With respect to the Pflum Trust's argument that the underlying property was transferred to FRP Investments, "[o]nce a right of action accrues, it becomes a 'piece' of intangible personal property called a 'chose in action.' " *Herr v United States Forest Serv*, 803 F3d 809, 821 (CA 6, 2015), citing *Sprint Communications Co v APCC Servs, Inc*, 554 US 269, 275; 128 S Ct 253; 1171 L Ed 2d 424 (2008). See also *Black's Law Dictionary* (11th ed) (defining chose in action in part as "[t]he right to bring an action to recover a debt, money or thing"); *In re Beatrice Rottenberg Living Trust*, 300 Mich App 339, 357; 833 NW2d 384 (2013) (a chose in action is personal property); *Fodale v Waste Mgt of Mich, Inc*, 271 Mich App 11, 21; 718 NW2d 827 (2006) (choses in action are intangible personal property interests and are not classified as real property). "Choses of action to enforce property rights do not, as a general matter, automatically transfer when the underlying property changes hands." *Herr*, 803 F3d at 821.

The Pflum Trust relies on a January 30, 2015 mineral deed, executed after plaintiffs filed suit on October 23, 2014, from the Pflum Trust to FRP Investments. However, this deed only transferred the trusts interest in the "oil, gas, and other minerals in and under that may be produced from the [property]" along with "an undivided interest and to all bonuses, rents, royalties and other benefits which may accrue under the terms of said lease(s) insofar as it covers the above described property[.]" The deed did not contain an assignment of the cause of action for breach of contract. In addition, the trust continued to pursue the breach-of-contract action and ultimately received

payment from the Fund.  FRP Investments did not even attempt to intervene as a party.  The Pflum Trust has not demonstrated that it is entitled to relief with respect to this issue.

We affirm.


/s/ Colleen A. O'Brien
/s/ Kathleen Jansen
/s/ Elizabeth L. Gleicher